IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**Civil Action No.**

PHILLIP MILLER,

        Plaintiff,

v.

DDH TRUCKING INC AND FEDEX GROUND PACKAGE SYSTEM, INC.

        Defendant.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, Philip Miller ("Miller"), states as his Complaint and Jury Demand against DDH Trucking Inc ("DDH") and Fedex Ground Package System Inc. ("Fedex"), the following:

### JURISDICTION AND VENUE

1. This court has federal question jurisdiction over this action pursuant to 28 U.S.C. §§1331 and 1343 (3) and (4), based on:

   a) Title VII, 42 U.S.C. § 2000e *et seq. and the ADEA;*

2. The unlawful employment practices alleged herein were committed within the Judicial District of Colorado.

### PARTIES

3. Miller adopts and incorporates paragraphs 1-2 as though fully set forth herein.

4. Miller is a Caucasian, male citizen of the United States and the District of Colorado and falls within the protected class of persons under the Civil Rights Acts of 1964, the ADEA and Colorado Anti-Discrimination Act.

5. During all relevant time periods, Miller was employed by either Apex Cartage, Inc. ("Apex"), DDH and jointly with FedEx.

6. Prior to and on or about August 14, 2020, Apex, DDH and FedEx were engaged in the business of operating package delivery and the movement of freight within the Judicial District of Colorado.

7. Apex and DDH, in complicity with FedEx, are employers as defined under Title VII, the ADEA and Colorado Anti-Discrimination Act.

## ADMINISTRATIVE PROCEDURES

8. Miller adopts and incorporates paragraphs 1-7 as though fully set forth herein.

9. Miller has timely and properly exhausted his administrative remedies by filing a complaint with the Equal Employment Opportunity Commission

10. This lawsuit is timely filed within 90 days after Miller's receipt of a Right to Sue letter from the E.E.O.C.  The Right to Sue letter was dated either May 27 or 28, 2021.  (See Exhibit 2 and 3) Miller did not receive the EEOC notices in the U.S. Mail until June 2, 2021

## GENERAL ALLEGATIONS

11. Miller adopts and incorporates paragraphs 1-10 as though fully set forth herein.

12. Miller worked for Apex in late 2018 there was a dangerous working condition in the Council Bluffs, IA Terminal in which Miller reported many times to Management at the location in which they absolutely neglected to address. Miller reported it all to OSHA in which OSHA contacted FedEx Ground.

13. On January 11, 2019, the FedEx Council Bluffs, IA Manager and the FedEx Ground Safety Manager for the Region met with Miller.  At the end of their meeting, Miller was accused by somebody at the Terminal that he was rude to them in so many words, however when Miller asked who it was, FedEx would not reveal who the person was.  After the meeting Miller was not satisfied with their response.    Miller wrote the FedEx Ground Regional Manager (David Allgaier). Miller received no response.

14. Miller also made another complaint to OSHA one month later due to retaliation where Miller was issued a Write-Up on February 11, 2019.  Miller did not agree with the accusation in the Warning Notice and describe further what happened if needed.  The Warning letter stemmed from Miller reporting another Driver smoking at the Fuel Pumps and reporting a Safety Issue with equipment.  Both incidents were reported to the Denver Linehaul Office with Linehaul Coordinators Devin and Nick respectively.

15. Again, as with the first OSHA Complaint, the Warning Notice issued by Miller's employer at the time Apex Cartage, was removed from his record.  It should be noted that at the time that Jerry DeVan of Apex Cartage issued the Warning Notice, Jerry DeVan had only taken over the company for about 2

months.  The incidents DeVan was referring to had occurred approximately less than a month when he was new.  Denver Linehaul Personnel took advantage of Jerry DeVan being new.

16. When Jerry DeVan issued the Warning Notice in person on February 11, 2019, he brought with him another Apex Cartage employee, Michele Hall.  Michele Hall is the Driver that twice before Miller reported to FedEx Ground her bringing her Husband onto the property to intimidate Miller.  Her Husband was a former Driver and was banned from the property.  It is unknown to Miller exactly what action FedEx Ground took with his two reports about Michele Hall's Security and Harassment towards him.

17. Several times Miller complained to Jerry Devan about the Chicago Team being late with their schedule.  Jerry DeVan eventually had Jason Hendricks of the Denver Linehaul Office contact the Chicago Terminal.

18. Immediately after the Chicago Terminal being contacted the Chicago Team began arriving 4 to5 hours late.  The 2nd time the Chicago Team did it on October 22, 2019. On October 22,2019 the Driver from the Chicago Team got out of his Truck from the passenger side, went to Miller when he was parked in his Truck, and began screaming at Miller while punching his Truck door and then punched and shattered Miller's Truck Spot Mirror before driving off.

19. Miller reported the incident to Mr. Jerry Devan, the FedEx Hotline, the Council Bluffs Terminal Manager (the same Manager with the Dangerous

Working Condition), the Council Bluffs Security (they took pictures of the damage) and Miller filed a report with the Council Bluffs Police Department.

20. FedEx Ground, after the October 22, 2019, incident, continued to let the Chicago Driver back onto the Council Bluffs Property.

21. After complaining to Jerry DeVan about the Chicago Driver being on the Council Bluffs Property, FedEx finally took the Chicago Driver off the Run, temporarily.

22. Shortly after the Chicago Driver was taken off the Run Jerry DeVan informed Miller that FedEx was putting the Chicago Driver back onto the Run. Miller asked Jerry DeVan to take Miller off the Run and substitute another Driver employed on the team, Kevin Lee, onto the Run until the problem could get straightened out.  Jerry DeVan said he needed to make a phone call and hung up.  Jerry DeVan called Miller back about 15-30 minutes later and took Miller permanently off the Run.  Miller objected to the removal being permanent and DeVan did not change his position.

23. Miller was then reassigned to a less desirable work assignment and then changed to another work assignment.  After further examination of the second offer Miller determined that the 2nd Run would be in violation of the DOT's Hours of Service Rule.   Miller wrote Jerry DeVan about the 2nd Run a detailed letter explaining the Run was an Illegal Run.  After an in-person meeting with Jerry DeVan to receive training on a new Computer Tablet for the Truck, Miller attempted to discuss the matter of the 2nd Run.  Jerry DeVan

was unwilling to comply with the law and discuss the matter with FedEx who created the run.  Miller subsequently had no other choice but to resign on November 29, 2019.

24. After leaving Apex Cartage it was considered "Peak Season" at FedEx Ground.  From December 10, 2019, to January 23, 2020, Miller worked for 3 different trucking companies to attempt to secure employment and income. West Texas Parcel Express, LG Trucking, and Frank Vilorio Enterprises. While employed as a Team Driver at West Texas Parcel Express his Team Partner Robert told me he had talked to four separate Dispatchers in the Linehaul Office about Miller that said he was a problem.  Jason Hendricks, Nick, Melinda, and Brandon.  Miller confronted Jason Hendricks.  Jason Hendricks knew about it, and he said to Miller he didn't say anything about Miller.  His Driving Partner refused to drive with Miller after a week.  After leaving West Texas Parcel Express Miller found a position with LG Trucking. Miller worked for LG Trucking driving to Raton, NM.  Miller was told by his Boss the start time of the Run, and if the Run was late to call him immediately.  This happened more times than not.  Linehaul also disrupted Miller's work on January 8, 2020, allowing trailers to be moved on Miller while he was in the middle of work.  The Linehaul Coordinator in charge of the shift was Rebecca.

25. On January 20, 2020, Miller began working at Frank Vilorio Enterprises to drive a Run to Casper, WY.  Miller's very first day on the job he went into the

Linehaul Office, and the Dispatcher was Rebecca.  She reassigned Miller off the Casper Run and wanted him to go to the Rail Yard.  The Rail Yard is an undesirable assignment, it was around the Midnight Hour, and Miller was no longer registered at the Rail Yard.  Miller ended up going home.

26. When Miller went back to the Linehaul Office the next day to go to Casper, WY he was being dispatched by a Dispatcher named Jayce.  Wyoming is notorious for hazardous wind conditions and Miller was beginning to discuss the knowledge of it with Jayce.  Rebecca interrupted Miller's conversation with Jayce and told him to leave.  Miller ended up doing three Runs to Casper, WY and had to quit.  Miller became very ill.  Miller went to the VA Hospital and was diagnosed with Influenza B.  Miller was incredibly sick for about a week and a half and could not work. Miller subsequently resigned on January 28, 2020, being unable to perform the job.

27. About a month later after leaving Frank Vilorio, and beginning to feel healthy enough to drive a Semi, on Tuesday, February 25, 2020, Miller began working for Doug Haiar at his company DDH Trucking Inc.

28. Miller went in on the weekend before starting to inspect his assigned truck.  Miller discovered that the truck was missing Paper Logbooks.  Miller went into the Linehaul Office and went up to the window.  The dispatcher Alex was at the window.  Miller asked for 2 Paper Logbooks.  She handed them to him.  Miller took them and began to walk away.  She then shouted at Miller

"You're Welcome".  Dispatchers Brandon and Jason Hendricks were also in
the Linehaul Office.

29. Miller's first day of work, February 25, 2020, he began to drive to Billings,
MT.  When Miller went into the DOT Scale House approximately 7 miles over
the Colorado/Wyoming border into Wyoming he learned that the Wyoming
DOT had closed Interstate I-25 due to the weather with no estimate of when it
would reopen.  Miller could not park on the Scale House property and there
were no other places to park due to other Trucks already filling up spots at
the Truck Stops down I-25 a few miles.  Miller called up Linehaul and
informed them of the status.  Miller talked to the Dispatcher Brandon.
Brandon would not give Miller permission to go back to Denver and said,
"Wait it out".  Due to driving Doubles, there was no place Miller could
legally park if no spots were available at a Truck Stop.  Miller called Doug
Haiar and he told Miller to return to Denver.

30. The Denver Linehaul Department continually kept on delaying Miller's
dispatches making him wait, jeopardizing a violation of the DOT 14-Hour
Rule.

31. On March 31, 2020, at 7:17 am Doug Haiar called Miller and said Linehaul
had called him wanting to know where Miller was.  Miller was in the Truck
Parking lot.  Miller informed Doug Haiar about the delayed dispatching and
the 14 Hour-Rule previously.  Miller asked Doug Haiar if the Trailer Doors
were closed and ready to go.  Haiar told Miller they were not.

32. On April 1, 2020, Miller informed Doug Haiar that the Wyoming DOT had put a Warning Sign that hangs over the Interstate stating "HAZARDOUS TRAVEL OUTLOOK, SNOW/SLICK ROAD, 9 PM – THURSDAY 11 AM. Miller told Doug Haiar it would be a good idea that he should delay the next day's dispatch by two hours so by the time Miller arrived in the Warning Area it would be over.  Doug Haiar agreed.

33. The following morning on April 2, 2020, Doug Haiar called Miller at 8:30 am wanting to know where he was at.  Miller told Doug Haiar he was in the Yard, and he should be in the Linehaul Office in two minutes.  Then two minutes later when Miller was parked at the Linehaul Office Doug Haiar called him back again.  Doug Haiar informed Miller that he had talked to the Dispatcher Rebecca and there was a miscommunication, and Miller would not do the Run.  Miller saw Jason Hendricks also walk out of the Linehaul Office.  He looked at Miller with a surprised look on his face.

34. Even if there was a miscommunication with Rebecca, it is unheard of that reassigning a Contractor's Run would be done without calling the Contractor first.  Obviously, Doug Haiar did not say to Rebecca that Miller's Truck would not be doing the Billings Run.

35. The 2nd missed dispatch from the Denver Linehaul Office was on April 8, 2020.  The Dispatcher Brandon was creating the Run and nobody informed Miller not to come in.  Miller was told by Doug Haiar that Linehaul was using an outside Contractor to do the Run that day.

36. The 3rd missed dispatch from the Denver Linehaul Office was on April 10, 2020.  The Dispatcher Brandon created a Special Dispatch for Miller to go to the Aurora Smart Post before driving to Billings, MT.  Miller had informed Doug Haiar and dispatchers in the Denver Linehaul Office previously that going to Aurora risked the DOT 14-Hour Rule.  Miller did not accept the dispatch and was subsequently told to go home.

37. Miller discussed the 3rd missed dispatch with Doug Haiar and if the Linehaul Office ever dispatched to the Aurora Smart Post before driving to Billings, MT.   There was another Billings Driver that had been there about a year. Doug Haiar texted Miller back saying Linehaul has never had a dispatch for the Aurora Smart Post first.

38. Miller was told the Billings; MT Run was to start at 12:30 am when beginning employment.  Over time the dispatching time was bumped up continually while he was on the DOT 14-Hour Clock risking a violation of the DOT Rule. Miller would compensate by coming in at a later time and the Linehaul would continue to make him wait more.

39. During sometime in the late Spring early Summer Miller went into the Linehaul Office as normally done to receive his Paperwork from the Dispatcher on Duty.  While at the Window a former DOT Officer named Sandra P. who was working at the Fort Morgan, CO DOT Scale House was working in the Linehaul Office.  In front of the group in Linehaul Sandra P. out loud began speaking about how she wrote Miller up at the Fort Morgan,

CO Scale House.  It was embarrassing and uncomfortable to Miller that she would disclose it to the entire group in Linehaul.

40. On June 27, 2020, Miller called into the Linehaul Office asking for information on his assigned Run, Trailer #'s, and if the Trailers were ready.  Dispatcher Alex answered the phone and provided the information.  The information was wrong.

41. On June 27, 2020, while trying to work with the information Dispatcher Alex gave Miller, he had to call into the Linehaul Office to verify it.  Miller talked with Jason Hendricks and he gave Miller the correct information.  Hendricks confirmed to Miller Alex told him the wrong information.  Miller did not know that he was on speaker phone during their conversation.  Miller said, "I think Alex needs to get her eyes checked".  Miller heard gasps in the background.

42. On June 27, 2020, when Miller went into the Linehaul Office to receive his dispatch papers Jason Hendricks was at the Window and in a loud, abrasive voice accused Miller of being late.  Miller told Hendricks to have Alex come here and Hendricks refused to call her.  Miller then told Jason H. to call Doug Hair and give him the phone when he was finished.  Jason H. called Doug Haiar and talked about one minute.  The only thing in the phone conversation Jason H. said was "Uh Ha, Uh Ha", Doug Haiar was doing all the talking.

43. On June 27, 2020, when Miller asked Jason H. why he didn't give Miller the phone, Jason H. replied that Miller was not his Boss.  Miller took the dispatch paperwork and left.

44. On June 27, 2020, while driving to Billings, MT Miller called the Linehaul Office and talked to the Admin Sandra P.  Sandra was in the Linehaul Office while Miller was talking with Jason Hendricks.  Miller asked Sandra to give the Manager Patrick Rule a message about what had occurred earlier.  The phone reception was bad, and Miller told her he would call her back when he stopped.   Before Miller had a chance to call Sandra P. back Dispatcher Alex had called Doug Haiar telling Doug not to call the Linehaul Office.

45. On June 27, 2020, Doug Haiar followed up their conversation with a Text Message stating that he thought the Linehaul Dispatchers were "whining" and to only call in for Trailer #'s and the times the Trailers close.

46. Due to multiple problems with Miller's dispatches to include June 27, 2020, Miller believes it was clear that it was a problem, and he was being Harassed, treated differently than other female drivers and those drivers that were younger.  FedEx Policy is to report Harassment to FedEx Management. Miller attempted to follow FedEx's Policy, and the Dispatcher Alex called Doug Haiar to prevent Miller from doing so.

47. On July 21, 2020, Miller Texted into Linehaul a standard message requesting the Load information for Miller's Run as per the new dispatch procedure.  On July 21, 2020, there was no response and Miller subsequently made two

attempts to call into Linehaul.  Miller was left on hold and the dispatcher never picked up the phone.  1 Hour and 10 minutes later Miller texted back telling the person monitoring the Text Messages this.  Policy is if there is no response within 10-15 minutes to then call in.  Miller was following prescribed procedure.

48. On Thursday, July 30, 2020, Miller was assigned for a Run to WaKeeney, KS. Miller went into the Linehaul Office and talked to Dispatcher Melinda.  While waiting Miller asked Melinda about what had occurred on July 21, 2020, with the new dispatching.  Melinda seemed confused and said, "you are going to WaKeeney".  Miller acknowledged WaKeeney and clarified it was about what happened the previous week.  Then the Dispatcher Rebecca came from around the corner.  She was obviously listening to the conversation, and said, "you are going to WaKeeney" and slammed the Linehaul Window shut on Miller.

49. After Rebecca slammed the Linehaul Window, Miller slid the Window open and said let me speak to the Manager.  Melinda said to Miller that Rebecca is the Manager.  Miller turned around and left the Linehaul Office and called Doug Haiar and told him what happened.

50. On August 2, 2020, Miller was assigned a Run to WaKeeney, Kansas scheduled to leave the Denver Terminal Gate at 8:00 a.m.  Miller was given this information the day before over the phone by Doug Haiar.  Miller had

the choice to pick either a Run to Wagon Mound, New Mexico or WaKeeney, Kansas.  Miller chose the WaKeeney Run.

51. At 5:26 a.m. Miller used the Text Line to request the WaKeeney, Kansas Run information from Denver Linehaul.  The Text Line is a new form of dispatching that has now become standard procedure in the last month.  By 5:28 a.m. Denver Linehaul had replied with all the necessary information including that the Run's dispatch time being 8:00 a.m.   Miller replied back to Denver Linehaul at 5:31 a.m. that he would leave out the Gate by 8:00 am.  Miller's reply at 5:31 a.m. served two purposes; that he received the message and his understanding of the message (Load is leaving the Gate at 8:00 a.m.)

52. Miller arrived at the Denver Terminal and did his usual tasks in the Yard prior for a Run.  At approximately 7:00 am Miller was contacted by Doug Haiar.  Miller answered the phone and he wanted to know if everything was OK.  Miller found this unusual.  This was a Run as any other Run, and he has been doing the job since April of 2014.  If there was a problem Miller knew how to handle it, and he would contact the appropriate person to let them know if needed.  Miller didn't ask the reason why and just assumed he had a reason.  Miller told Doug he just hooked up to a Dolly (609047), it was 7:00 am, and Miller should be able to get out of the Gate by 8:00 am.  Miller did tell him that if Linehaul gave me the wrong locations of the Trailers this could add time to me leaving out the Gate and possibly leave slightly after 8:00.  Miller would have to search the entire Yard for the Trailers which takes time.

Linehaul has given the wrong locations of Trailers in the Yard many times before in the past.  Miller located the 2 Trailers that he was assigned in the Inbound part of the Yard, as he was told where they would be.  Miller had not had to search the entire Yard.  The Trailer Numbers were 809136 and 819202.  The Seal Numbers for the Trailers were 43321618 and 43321592 respectively.

53. Miller did the work and put together the two Trailers with the Dolly to create a Set of Doubles.  Miller did all the necessary Pre-Trip inspection work for the Set of Doubles.  Everything was fine to leave out the Gate.  At 7:53 a.m. Miller used the new Denver Text Line and gave the required information for the Load.  This includes the Driver Name, Truck Number, the Assigned Run (WaKeeney 8672), the two Trailer Numbers, the Seal Numbers for each Trailer, and the Dolly Number.

54. At 7:57 a.m. Miller received a message via the Dispatch Text Line from the Linehaul Office.  Usually, Miller would be told everything is fine and would have permission to leave the Gate with the Load to deliver it to its scheduled location (WaKeeney 8672).   This message was different indicating a problem.  The message from the Linehaul Office was stating that the Seal Number that Miller had reported did not match the Seal Number that Linehaul expected to be on the First Trailer.  Miller was instructed to verify the Trailer Seal Number.  Miller did verify the Seal Number on the First Trailer.  The Seal Number that he had reported via the Dispatch Text Line was indeed the Seal

Number that he had reported to be on the first Trailer.  The first thing that should be noted at this point in the statement is that the two Trailers were in the Inbound part of the Yard.  This would mean that they were not loaded by Package Handlers at the Denver Hub but were instead delivered to the Denver Hub by another Truck from another location and Dropped/Parked in the Inbound part of the Yard.  The Inbound part of the Yard is the receiving area for Trailers coming in from outside the Denver Terminal that are being delivered to the Denver Terminal.   It is Standard Procedure when bringing in and delivering any Trailers to the Denver Hub that those Trailers are dropped in the Inbound part of the Yard.  The second thing that should be noted are the Seals on both of the Trailers.  The Seals that were on the Trailers were not broken, meaning nobody went into the Trailers.  The third thing that needs to be noted are the Seal Numbers themselves, 43321618 and 43321592.  Both Seal Numbers begin with the numbers 43321.  Both Seal Numbers are very close to each other numerically meaning they were loaded and sealed at the same location.  Locations generally use a batch of seals that run numerically one after another.  Both Trailers, not one Trailer but two Trailers, were in the Inbound part of the Yard.  It would be very reasonable and highly likely to assume both Trailers came from, and were loaded, at another facility and not the Denver Terminal.  With the facts as explained in regard to both Trailers and the Seal Number, Miller was left at that point in time with Linehaul's last Text Line Message to verify the Seal Number on the first Trailer.  Miller was

on the Parking/Staging Pad next to the Linehaul Office, literally a 10 second walk from the Linehaul Office.  It was very close to the scheduled departure time.  Instead of playing Phone Tag burning up time, combined with the nature of the issue, it would be far more time efficient and reasonable to discuss the discrepancy of the first Trailer's Seal Number face to face with whoever was On Duty in the Linehaul Office.  Beyond the standard Dispatching Text Line, the Dispatching Text Line is not meant for longer and complex conversations.  Dispatch Texting serves the purpose of general load information for dispatches, not complex problems and conversations.

55. Miller walked into the Linehaul Office, and the Linehaul Dispatcher Alex was at the Window.  The sliding Window was closed.  Miller stood in front of the Window to discuss the issue.  Alex did not acknowledge Miller while she saw him standing in front of the Window.  Miller then slid the Window open about 12 inches to talk with her.  She had a stern tone with Miller and told him to Text and slid the Window back closed.  Miller walked away into the Driver Lounge about 15 feet away and used the Text Line to communicate.

56. Usually in the past when Miller had different Seal Numbers, he would verify the Seal Number and take a picture of it to show the Linehaul Dispatcher. Miller texted Alex, that from previous attempts days before, Text Pictures do not work and are not received by the Denver Text Line from his phone (the Text Line for some reason unknown does not receive pictures from Miller's phone).   Miller had discussed this issue with another Linehaul Dispatcher

Jason Hendricks, and both concluded that the next time Miller was in the Yard he would go into the Linehaul Office to see if they could fix the issue of the Text Line not receiving pics from his phone.  That is one of the things Miller thought he would do with Alex besides the problem of the Seal Number on the first Trailer.   It is just common knowledge and understood that Drivers and Linehaul Dispatchers need to work closely together at times within the job when things do not operate as planned.

57. At this time, it is now past 8:00 a.m., 8:08 a.m. and Alex stated she would change the Seal in 5 minutes via the Text Line.   While the texting was happening, another Driver walked into the Linehaul Office and went to the Window.  The other Driver and Alex began having a conversation.  Miller could not hear exactly what it was being said, but he heard them talking to each other.  Alex and the other Driver finished talking to each other and the other Driver exited the Linehaul Office.

58. Knowing Alex had not yet changed the Seal, and the fact as was previously explained that the Seals were close together numerically, Alex possibly could have made a mistake.  It was reasonable to let Alex know this before wasting more time.   Dispatchers do make errors from time to time.  This is not unusual.  With the Seal Numbers as they were numerically close together it was a real and legitimate possibility.  Miller was standing about 15 feet from the Window in the Linehaul Office.  Sending a Text Message made no sense, Miller was standing right there in the Linehaul Office just steps away.

Alex was just talking to the other Driver, so Miller went back to the Window. Miller did not open the Window this time and instead knocked on the Window. Alex looked at him and immediately picked up her phone and took pictures of him. Miller held up his Notepad with the information. Alex would not communicate with Miller. Miller just looked at what she was doing and walked away out of the Linehaul Office and back to his Truck.

59. Due to Doug Haiar being concerned about the Run and if there were any problems, while Miller was texting Alex prior to going back to the Linehaul Window for the second time, Miller also texted Doug to call him. Doug called Miller and Miller explained what was happening. Doug said send him the picture of the Seal and he would text the picture of the Seal to Alex. Miller had no idea exactly how long Alex's conversation with the other Driver would be while he was standing inside the Linehaul Office. Miller experienced Drivers stand at the Window for over ten minutes, so Miller told Doug he would send him a picture of the Seal Number in question.

60. When Miller went back to his Truck Doug called Miller telling him he had not received the text picture. Doug was very prompt and concerned about the situation. Doug was taking the matter seriously. Immediately after Doug began speaking, Miller saw Alex walk around the building and come into his vision. Miller told Doug that Alex was coming, and he would call him back.

61. By now the Load to leave the Gate had become late.  Miller got out of the Truck and asked what the problem was.  Alex would not talk to Miller.  Alex continued walking to the Trailer in question and changed the Seal with a new Seal.  With her refusing to speak, Miller said to Alex if he has this problem again, he will talk to her Supervisor.  She did not say anything.  Alex continued to walk away back towards the Linehaul Office.  Miller then asked Alex if everything was OK now (meaning the Load and if he could leave).  Alex's back was to Miller.  She raised her hand up and gave Miller the OK sign with her thumb up.

62. August 3, 2020, Miller was contacted by Doug Haiar at 11:35 a.m.  Doug informed Miller that Alex had filed a report on him, and that Miller was not to go onto FedEx property.  Doug told Miller that Pat Rule, Alex's Supervisor, called him and told him that Alex felt "threatened".

63. Miller never once threatened Alex.  Miller knew that FedEx had a new dispatch system that uses text messaging; however, it is his understanding it is for standard template information for dispatching information that could possibly be presented to DOT Law Enforcement if requested.  With Miller being right at the Linehaul Office, a mere 10 second walk away, and given the nature of the issue and all the information and its detail, Miller thought it was more efficient and better to go in given the current time and schedule.   Miller had no knowledge of who it would be in the Linehaul Office that he would be talking to when he entered.

64. Miller did not know it was a major infraction, or an infraction at all for that matter, to discuss things that are complicated in the Linehaul Office.  It makes sense to go into the Linehaul Office when there is a problem of the nature that they were dealing with.  FedEx operates on schedules and unforeseen things do happen.  It is just part of the job.  Often, things do not go as planned, and it is reasonable that a Driver does, and should, go into the Linehaul Office depending on the issue.

Nothing that occurred could be construed as threatening, especially in light of the fact that Miller walked away after Alex refused to talk to him, told him to Text, and closed the Window.  The second time at the Window there was nothing verbally spoken.

65. It is upon information and belief that Miller has been treated differently in the manner in which FedEx and its partner, DDH, investigated the August 2, 2020, incident and the way they treated Miller versus the linehaul employee considering the multiple previous incidents of improper behaviors and clear impediments the linehaul employees had placed on Miller since October 2019.

66. Upon information and belief, Mr. Miller was treated differently than other driver's due to his prior complaints of OSHA and DOT violations and was discriminated against based on sex and age.

## FIRST CLAIM FOR RELIEF

### (Wrongful Termination due to Gender)

67. Miller hereby adopts and incorporates paragraphs 1-66 as though fully set forth herein.

68. FedEx and its joint employer DDH are employers covered by Title VII.  DDH is also covered pursuant to Colorado Civil Rights laws as a potential employer with less than fifteen employees.

69. Miller is a Caucasian male and was at all relevant times, a putative employee of FedEx and DDH.

70. Prior to and on or about August 14, 2020, Miller was employed by Defendants.  Miller was employed as a long-haul truck driver.

71. Miller began receiving unfair treatment from FedEx beginning in October 2019, after filing a complaint regarding a number of issues in the workplace.

72. Upon information and belief, FedEx and DDH's relationship was such that FedEx controlled all of Miller's work and DDH had no control over the discriminatory practices of FedEx.  In fact, DDH, when FedEx demanded the termination of Miller, DDH agreed and released him after a defective investigation and improper discrimination of Miller.

73. Starting in October 2019 FedEx and DDH began intentionally treating Miller differently than other employees who did not file complaints.

74. Miller was terminated because he is a male and the linehaul employee who was at fault was female and she was treated favorably when she violated FedEx's policy.

75. The conduct of FedEx and DDH in removing Miller constitutes retaliation in violation of Miller's rights as guaranteed by Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000 (e) *et. seq.*

76. FedEx and DDH acted, or its failure to act was done, with malice and with reckless indifference to Miller's federally protected rights.

77. As a result of FedEx and DDH's  actions, by and through its employees and agents, and pursuant to a theory of respondent superior, Miller has, and will continue to suffer substantial damages in amounts to be shown at trial, including without limitation, loss of front and back wages, earnings, future benefits, accumulated benefits resulting from long-term employment, loss of retirement benefits, employment opportunities, future earning capacity, mental and emotional suffering, inconvenience, attorney fees, court costs, and non-economic damages such as mental anguish, loss of enjoyment of life, inconvenience and other economic and non-economic damages to be determined at trial.

## SECOND CLAIM FOR RELIEF

### (Age Discrimination – Title VII)

79.  Miller adopts and incorporates paragraphs 1-78 as though fully set forth

herein.  Miller is of Caucasian over the age of 40 and therefore a member of a protected class of employees under Title VII of the Civil Rights Act of 1964.

80.  Miller was employed by DDH a partner with FedEx as a long-haul truck driver until August 14, 2020.

81.  Miller was well qualified and had the work experience necessary for the position of long-haul truck driver.  Miller's employment terminated due to FedEx not completing a complete investigation of all of his claims of rule and law violations and finally taking the side of an employee in the linehaul office that was under the age of 40 when it was improper to do so.

82.. Upon information and belief, subsequent to the termination of Miller's employment, his position was filled by, and his job duties were assumed by, younger employees.

83.  Because of the willful, purposeful and intentional actions of Defendants, and as a direct and proximate cause thereof, Miller has been denied his right to equal employment in violation of Title VII of the Civil Rights Act of 1964, as amended, and Miller has suffered and continues to suffer damages, including but not limited to, loss of front and back wages, earnings and benefits, diminution of future earning capacity, loss of accumulated benefits resulting from long-term employment, non-economic damages such as mental anguish, loss of enjoyment of life, inconvenience and other non-economic damages, loss of retirement benefits, attorney fees, costs and expenses, and other damages to be determined at trial.

## THIRD CLAIM FOR RELIEF

### (Age Discrimination in Violation of the Age

### Discrimination in Employment Act (ADEA) 29 USC 621)

84.    The foregoing paragraphs are realleged and incorporated by reference herein.

85.    The Defendants' conduct as alleged above constitutes discrimination based on Age discrimination in violation of ADEA.  The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendant's discriminatory animus.

## FOURTH CLAIM FOR RELIEF

### (Reprisal for Engaging in Protected Activities)

86.    The foregoing paragraphs are realleged and incorporated by reference herein.

87.    The Defendants' conduct as alleged above constitutes retaliation against the Plaintiff because he engaged in activities protected by Title VII, the ADEA and Colorado Anti-Discrimination Act.  The stated reasons for the Defendants' conduct were not the true reasons, but instead were pretext to hide the Defendants' retaliatory animus.

## PRAYER FOR RELIEF

**WHEREFORE,** Miller prays that this Court enter an Order as follows:

   A.  Enjoin Defendants from engaging in unlawful discriminatory conduct;

B.  Restore Miller's employment or in lieu of reinstatement, order back pay, front pay and benefits associated with his prior employment;

C.  Award Miller lost wages and the value of other benefits of employment up to the date of reinstatement;

D.  Award Miller compensatory damages in an amount to be determined at trial;

E.  Award Miller punitive and exemplary damages in an amount to be determined at trial;

F.  Award Miller costs of this action and reasonable attorney's fees;

G.  Grant Miller such other and further relief as this Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL TO A JURY OF SIX (6) ON ALL ISSUES RAISED IN THE PLEADINGS**

Respectfully submitted this 24th day of August 2021.

**FLESCH & BECK LAW**

*S/ Kevin C. Flesch*

_____

Kevin C. Flesch, #27278
333 W. Hampden Avenue, Suite 710
Englewood, CO 80110
PH: 303-806-8886
FX: 303-806-8882